IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SHEILA L.,

      **Plaintiff,**

  v.                          Civil Action 2:24-cv-04253
                                Judge James L. Graham
                                Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Shelia L. brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") prior to November 23, 2023. The Undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** the case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.    BACKGROUND**

Plaintiff filed applications for DIB and SSI on May 5, 2022, alleging disability beginning on May 28, 2021, due to "clogged artery, depression, high blood pressure, high cholesterol, and Type 2 diabetes with neuropathy." (R. at 254; *see also* R. at 224–33, 234–39). After her applications were denied initially and on reconsideration, Administrative Law Judge Matthew Winfrey ("ALJ") held a telephone hearing. (R. at 46–70). The ALJ issued a partially favorable written decision finding Plaintiff disabled as of November 27, 2023, but not before that date. (R. at 7–38). The Appeals Council denied Plaintiff's request for review, making the ALJ's opinion the Commissioner's final decision. (R. at 1–6).

Plaintiff filed the instant case seeking a review of that decision on December 10, 2024 (Doc. 1), and the Commissioner filed the administrative record on February 10, 2025 (Doc. 7). The matter is ripe for review. (*See* Docs. 8, 10, 11).

A. **Statements to the Agency and Hearing Testimony**

The ALJ summarized Plaintiff's statements to the agency and hearing testimony as follows:

> [Plaintiff] reported she was unable to engage in work related activities due to a combination of conditions, including clogged artery; depression; hypertension; hyperlipidemia; diabetes with neuropathy; and obesity (Exhibit 2E). [Plaintiff] reported she was not able to stand for long and reported that her hands and feet go numb (Exhibit 4E). She reported some lightheadedness and blurred vision due to her conditions and her medication use (Exhibit 4E).
>
> \*\*\*
>
> [Plaintiff] reported that she lives in a home with her niece. She reported staying in a downstairs bedroom, because she did not use the stairs. [Plaintiff] noted she has a driver' license, but does not drive. She reported she does not drive due to her blurred vision and because her prescribed gabapentin medication makes her dizzy. [Plaintiff] reported last working in May 2021.
>
> \*\*\*
>
> [Plaintiff] reported experiencing numbness and pain finding it hard for her to stand. [Plaintiff] reported when she was caring for her son she did not care for her diabetes. She reported she is not able to stand to wash her dishes. [Plaintiff] reported the pain bothers her. She explained she does not sleep well. [Plaintiff] reported taking medication, but noted that gabapentin bothers her vision. She reported that she has diarrhea from her insulin and other diabetic medications. [Plaintiff] reported that on a good day she will try to go to the store. She reported maybe going three times a month. She reported that her niece will help her with that. [Plaintiff] reported being able to watch television and understand the programming.
>
> [Plaintiff] reported she was involved in counseling for a little bit.
>
> [Plaintiff] reported some days she can go up and down the stairs, but she reported her feet go numb. She reported she can move them, but cannot feel them. She explained she has fallen due to the condition. [Plaintiff] reported her niece has helped her perform personal care activities before. She reported being able to lift

ten pounds but noted at times she could lift less and would have to use her entire arm. [Plaintiff] reported she could walk 40–50 feet and would need a break before continuing. [Plaintiff] reported she could stand about 20 minutes.

During the day, [Plaintiff] reported getting up and washing herself up, drinking coffee, and sitting on the couch. She reported watching television, taking medication, and napping. [Plaintiff] reported sometimes she will do crossword puzzles. [Plaintiff] reported she does not do much. [Plaintiff] reported sometimes she will do some cooking with the assistance of a chair. [Plaintiff] reported she will wash dishes with the help of a chair and her niece will rinse them. [Plaintiff] reported that she will make up her bed and will bundle up the trash. She noted she will not vacuum, but will wash up a few loads of clothes sometimes.

In order to treat pain, [Plaintiff] reported she is taking Tylenol and using gabapentin. She reported working on getting her A1C down to help with her pain. She reported working towards bariatric surgery. [Plaintiff] reported that her glucose monitor tells her every 30 minutes what her blood sugar is. She reported her glucose levels are 250–300. She reported they are improved with 3 different insulins, but still high. [Plaintiff] reported she could use buttons and zippers.

[Plaintiff] reported 3 good days out of a week and 15 good days out of the month.

[Plaintiff] reported neck pain and shoulder pain. She reported when she gets pain there it makes her panic thinking that she could be having a stroke. [Plaintiff] reported smoking 5–6 cigarettes per day. [Plaintiff] reported they continue to check her carotid artery. She reported they check her A1C but she cannot have surgery to clean it out until her A1C is reduced to at least 7, noting that she is currently considered "high risk". She reported she is not able to reach overhead with her left arm.

When questioned by her attorney, [Plaintiff] reported she has problems balancing. She reported her most comfortable position was sitting with her legs propped up. [Plaintiff] reported the bulk of her day is spent in that position. [Plaintiff] reported they have increased her gabapentin medication because her pain and numbness symptoms return. [Plaintiff] reported she sits in the tub with Epsom salts to help with her pain about twice per week. [Plaintiff] reported dizziness and shortness of breath a couple hours per day. She reported her shortness of breath can be triggered when she is tired or after she takes medication.

(R. at 17–18).

**B.     Relevant Medical Evidence**

The ALJ summarized Plaintiff's medical treatment and records as follows:

3

In terms of [Plaintiff]'s alleged weight, the record supports [Plaintiff] maintained an obese body habitus. [Plaintiff] reported she was five feet four inches tall and weighed 270 pounds (Exhibit 2E). The record supports her frame, but documents fluctuations in her weight during the period under adjudication. With her frame and weight fluctuation, the record documents body mass indexes consistently greater than 40, indicative of morbid obesity (Exhibits 1F/3, 4; 3F/48, 50; 5F/15; 9F/10; 12F18). [Plaintiff] was counseled on a low calorie diet and given nutritional counseling (Exhibit 3F/48; 5F/16). [Plaintiff] was taking dual medication to treat her diabetes but that was also to encourage weight loss, including Trulicity and Mounjaro (Exhibit 12F/10). Despite the use of the treatment modalities and weight loss counseling, [Plaintiff] reported weight gain (Exhibit 12F/17). Therefore, in June 2023, [Plaintiff] was afforded additional exercise counseling and a referral to the bariatric weight loss center to discuss bariatric surgical interventions (Exhibit 12F/18). [Plaintiff] noted that she could not pursue any surgery until her A1C had decreased (testimony).

\*\*\*

[Plaintiff] was diagnosed with type II diabetes mellitus with diabetic neuropathy. In November 2021, upon consultative examination, [Plaintiff] reported being type II diabetic and taking insulin (Exhibit 1F/3). The examination notes document lower extremity paresthesia and diabetic neuropathy (Exhibit 1F/3).

In February 2022, [Plaintiff] presented to her primary care provider for management of her diabetes (Exhibit 5F/33). [Plaintiff]'s diabetic condition was described as being uncontrolled as her A1C was 11 (Exhibit 5F/35). [Plaintiff] reported pain in her extremities as well as numbness and was diagnosed with corresponding neuropathy (Exhibit 5F/38). [Plaintiff] was started on gabapentin prescribed twice per day (Exhibit 5F/38). In March 2022, [Plaintiff]'s A1C remained over goal (Exhibit 5F/24). Her numbers were trending toward goal, but they were not at goal (exhibit 5F?24). [Plaintiff] reported ongoing neuropathic pain, but admitted she was not taking her gabapentin as prescribed and was counseled to take the medication as it was intended/prescribed (Exhibit 5F/24). [Plaintiff] during the same month was treated for hyperglycemia (Exhibit 3F?9). [Plaintiff] was reporting bilateral extremity pain and showed some sensory deficit to the right lower extremity (Exhibit 3F/13). While she exhibited some sensory deficit, there was no evidence of weakness and intact coordination (Exhibit 3F/13). [Plaintiff] showed some tenderness in the lower extremities, but motor strength remained intact (Exhibit 3F/15). During April 2022, [Plaintiff] exhibited elevated glucose with decreased sensation in the right upper extremity, consistent with diabetic neuropathy (Exhibit 3F/43, 48, 51). The record supports [Plaintiff]'s A1C remained elevated, over 10 (Exhibit 3F/51). [Plaintiff] continued to exhibit some mildly reduced sensation to vibration in the lower extremities, but gait was normal, coordination was intact, and there was no evidence of tremor (Exhibit 3F/58). In May 2022, [Plaintiff] was taking multiple medications including insulin for her diabetic condition (Exhibit 5F/10). In August 2022, the record supported

adjustments in her medications and medication doses had made some positive benefit in reducing her A1C to 9.5 (Exhibit 10F/31). [Plaintiff]'s A1C remained above goal at 9.6 in November 2022 (Exhibit 12F/44). Her diabetic medications were again adjusted during December 2022 (Exhibit 12F/39).

In January 2023, [Plaintiff] was continued on gabapentin for neuropathy (Exhibit 12F/32). The medication was continued in April 2023 (Exhibit 12F/28). Additional treatment notes from April 2023 support [Plaintiff] was attempting to comply with her diabetic diet but due to poor control and her A1C remaining over 10 her insulin and other diabetic medications required increase (Exhibit 13F/16). In May 2023 [Plaintiff]'s diabetic medications were adjusted (Exhibit 12F/20). In July 2023, [Plaintiff] reported taking her medications as prescribed, but noted that her glucose monitor was alerting to some hypoglycemic episodes at night (Exhibit 12F/3). [Plaintiff]'s diabetic medications were again adjusted (Exhibit 12F/9).

\*\*\*

[Plaintiff] was noted to have hypertension and hyperlipidemia. In terms of her hyperlipidemia, the record supports [Plaintiff] was prescribed pravastatin medication in early 2022 (Exhibit 5F/38). In August 202[2], [Plaintiff] was taking her statin medication as prescribed, but admitted poor tolerance to the medication, due to residual muscle pain in her legs (Exhibit 10F/22). Therefore, her medication was changed to ezetimibe (Exhibit 10F/24). [Plaintiff] was continued on Ezetimibe medication during 2023 to control her lipid condition (Exhibit 12F/28).

In terms of her hypertension, the record supports [Plaintiff] had a longitudinal history of hypertension. During February 2022, [Plaintiff] reported some dizziness but admitted that the symptoms resolved with treatment of her hypertension, including taking her prescribed medication (Exhibit 5F/36). In March 2022, [Plaintiff] sought emergent treatment for a dull pain on the left side of her chest and was described as being hypertensive upon her admission (Exhibit 3F/9, 12). In April 2022, [Plaintiff] was notably restarted on her blood pressure regimen. In May 2022, [Plaintiff] reported hypertension with a slight headache, but reported no leg swelling, confusion, visual disturbance, dizziness, shortness of breath, or chest discomfort (Exhibit 5F/14). At that time, her blood pressure was only mildly elevated and was noted to be improving (Exhibit 5F/14). [Plaintiff] exhibited normal breath sounds and normal heart sounds, showing no edema in her extremities (Exhibit 5F/15). [Plaintiff] was counseled on the dash diet and her medications were adjusted (Exhibit 5F/16). [Plaintiff] was continued on conservative hypertensive medication management in October 2022 (Exhibit 10F/11). The record supports her hypertensive condition continued to require conservative medication management during 2023 (Exhibit 12F/27).

While [Plaintiff] was diagnosed with hyperlipidemia and hypertension, the record supports both conditions were generally well managed with conservatively prescribed medication regimens. [Plaintiff] evidenced normal cardiac testing and

chest testing showed [Plaintiff]'s cardio mediastinal silhouette was normal (Exhibit 3F/18, 27).

[Plaintiff] was assessed with carotid artery stenosis. In November 2021, [Plaintiff] was noted to have a normal cardiac rate and rhythm (Exhibit 1F/4). In March 2022, [Plaintiff] reported a dull pain to the left side of her chest, describing the pain as "intermittent" (Exhibit 3F/10). [Plaintiff] reported the pain, at its worst was associated with shortness of breath and nausea (Exhibit 3F/10). Despite her reports of chest pain [Plaintiff] was noted to have normal ECG findings and her cardiac findings upon chest imaging were within normal limits (Exhibit 3F/18, 27). During April 2022, [Plaintiff] sought emergent treatment for chest pain, back pain, and shortness of breath (Exhibit 3F/38). At that time, [Plaintiff] exhibited cervical adenopathy (Exhibit 3F/40). A head CT showed no acute intracranial abnormality, but CTA of the head and neck showed 90 percent stenosis in the proximal left internal carotid artery and 50 percent stenosis in the cavernous segment in the right internal carotid artery with 50 percent stenosis in the proximal basilar artery (Exhibit 3F/48). [Plaintiff] was encouraged to stop smoking and to continue her statin medication (Exhibit 3F/66). It was also recommended she follow up with providers to discuss an outpatient left carotid endarterectomy (Exhibit 3F/66). In April 2022, [Plaintiff] followed up to discuss preoperative testing (Exhibit 3F/119). [Plaintiff] showed normal pharmacologic stress electrocardiogram and normal SPECT myocardial perfusion imaging (Exhibit 3F/121). In April 2022, [Plaintiff] subsequent underwent a vascular surgeon consult and the consultative examination noted [Plaintiff] wanted to hold off on surgery to optimize her medical risk, quitting smoking and controlling her diabetes, which was found to be an acceptable plan (Exhibit 4F/17). During July 2022, the treatment record noted [Plaintiff] would require surgery once she optimized her medical risk, quit smoking, and controlled her diabetes (Exhibit 13F/52). In August 2022, [Plaintiff] reported left facial numbness and testing supported ongoing stenosis to the proximal to mild left internal carotid artery (Exhibit 9F/11), but no stroke was appreciated and there was no evidence of mass effect or intracranial hemorrhage (Exhibit 9F/11). It was recommended [Plaintiff] follow up with her vascular provider (Exhibit 9F/11). In November 2022, [Plaintiff] underwent an updated carotid ultrasound supporting mild calcific plaque in the proximal right internal carotid artery of less than 50 percent and critical heterogenous plaque in the proximal left internal carotid artery suggesting severe stenosis (70–99 percent) (Exhibit 11F/20).

While [Plaintiff] continues to exhibit carotid artery stenosis, which she subjectively reports at times causes her to experience lightheadedness, she has undergone no specific invasive treatment for the condition. The record supported [Plaintiff] opted to attempt to control her surgical risk factors before proceeding with invasive care. It should be noted [Plaintiff] testified she has cut down on smoking, but has not yet engaged in smoking cessation and reported that her A1C level remains elevated (testimony). [Plaintiff] has not required recent recurrent emergent treatment related to her carotid artery stenosis. Further, the imaging

supports ongoing stenosis, without notable deterioration/worsening in the condition.

[Plaintiff] was diagnosed with degenerative joint disease of the left shoulder. In November 2021, [Plaintiff] reported left shoulder pain, but imaging of the shoulder was normal (Exhibit 1F/2). Upon consultative examination at that time, [Plaintiff] evidenced pain to the AC joint with minor decreased range of motion with abduction an flexion (Exhibit 1F/4). While there was some reduced range of motion, [Plaintiff] showed no synovitis in the shoulder or swelling/edema (Exhibit 1F/4). [Plaintiff] evidenced some slight decreased strength at 4/5 in the shoulder (Exhibit 1F/4, 6). However, [Plaintiff] maintained intact grip strength in the left hand (Exhibit 1F/7). During February 2022, [Plaintiff] exhibited tenderness with palpation of the joint line and there was decreased range of motion of the shoulder due to pain and guarding (Exhibit 5F/37). [Plaintiff] was given pain gel by her primary care provider for her shoulder symptomology (Exhibit 5F/38). During April 2023, [Plaintiff] underwent repeat shoulder imaging which evidenced mild to moderate AC joint degenerative changes, a subchondral cyst, and some minimal degenerative changes in the glenohumeral joint (Exhibit 11F/8). [Plaintiff] was referred to physical therapy (Exhibit 12F/28). During June 2023, [Plaintiff] reported chronic left shoulder pain worse with lifting (Exhibit 14F/2). [Plaintiff] reported aching pain and limited range of motion with stiffness (Exhibit 14F/2). Upon examination [Plaintiff] was assessed with positive rotator cuff impingement syndrome and degeneration of the left shoulder AC joint (Exhibit 14F/4). [Plaintiff] could not have a steroid injection because of her coexisting elevated A1C level, but was referred to physical therapy (Exhibit 14F/5). In July 2023, [Plaintiff] reported ongoing left shoulder pain (Exhibit 12F/3).

[Plaintiff] considered the updated imaging and ongoing reports of left shoulder pain when additionally limiting [Plaintiff] to no more than occasional overhead reaching with the left upper extremity.

[Plaintiff] was diagnosed with degenerative disc disease of the cervical spine. In April 2022, when assessing other areas of her body, imaging supported degenerative disc disease with endplate changes and endplate osteophyte formation at the C6–7 level (Exhibit 13F/12).

\*\*\*

[Plaintiff] reported radiating back pain into her right leg and was diagnosed with sciatica. In July 2022, [Plaintiff] sought emergency room treatment for reports of severe pain in the right glute down into the right leg, affecting her sleep (Exhibit 11F/41). [Plaintiff] showed tenderness to the right glute and some reduced strength at 4/5 in the right leg otherwise intact strength to her extremities at 5/5 (Exhibit 11F/43). [Plaintiff] was treated with some acute medication management and was told to follow up with her primary care provider (Exhibit 11F/47). During August 2022, [Plaintiff] again sought emergent treatment for reports of lumbar spine pain

radiating into the right lower extremity with numbness (Exhibit 9F/9). [Plaintiff] reported her pain into the leg was worsening with walking and changing position (Exhibit 9F/9). The physician noted such symptoms sounded [like] sciatica and there were no present "red flag" symptoms (Exhibit 9F/10). [Plaintiff] was subsequently given Toradol for pain (Exhibit 9F/10). [Plaintiff] was prescribed lidocaine patches and counseled on the importance of performing back stretches and exercises within her home (Exhibit 9F/11). She was counseled on requesting formal therapy from her primary care provider (Exhibit 9F/11). During September 2022, [Plaintiff] reported intermittent, acute, but recurrent back pain, worse with standing, walking (Exhibit 10F/13). Upon telehealth appointment, [Plaintiff] was in no appreciable distress (Exhibit 10F/14). She was given a steroid and Flexeril medications as well as low back exercises to perform for acute right sided low back pain with right sided sciatica (Exhibit 10F/15). During October 2022, [Plaintiff] sought treatment for radiating right leg pain worse with standing/walking and back stiffness with paresthesia into the legs (Exhibit 10F/9). [Plaintiff] reported she did not require the use of any assistive device (Exhibit 10F/9). She did exhibit an antalgic gait and she showed pain with palpation of the mid right low back (Exhibit 10F[/]11). [Plaintiff] was given an acute steroid medication, an injection, lidocaine patch, and was instructed to continue using gabapentin medication, as well as restarting Flexeril medication (Exhibit 10F/11). Upon follow up, she reported having four days of her steroid taper remaining (Exhibit 12F/46). [Plaintiff] reported that her pain is more manageable, and she was again able to cook and clean for herself (Exhibit 12F/46). [Plaintiff] noted that she was having some increased glucose levels due to the steroid medication treatment (Exhibit 12F/46).

While [Plaintiff] was referred for formal physical therapy for her condition, the record does not support that such interventions were ever pursued as such therapy treatment notes were not part of the formal record. [Plaintiff] continued to report back pain, but showed no more than an intermittent antalgic gait and only some slight 4/5 intermittent/acute right leg weakness. There was no appreciable atrophy of any extremity. [Plaintiff] did not require the use of assistive devices or ambulatory aids. [Plaintiff] did not seek treatment for falls/fall related injuries due to her noted spinal symptomology. The record shows treatment for sciatica, but does not contain any specific imaging of the lumbar spine or referrals for treatment with spinal specialists. [Plaintiff] had a pain injection but there was no discussion of any invasive spinal specific interventions.

(R. at 18–23).

### C. The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity since her alleged onset date of May 28, 2021. (R. at 12). The ALJ determined that Plaintiff has the

8

following severe impairments: type II diabetes mellitus with neuropathy; obesity; degenerative joint disease of the left shoulder; carotid artery stenosis; hypertension; hyperlipidemia; degenerative disc and joint disease of the cervical spine; and sciatica. (R. at 13). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment. (R. at 16).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [Plaintiff] could occasionally climb ramps and stairs. She should avoid climbing ladder, ropes, and scaffolds. Plaintiff could occasionally stoop, kneel, crouch, and crawl. [Plaintiff] should avoid balancing as defined by the SCO. [Plaintiff] should avoid exposure to workplace hazards such as unprotected heights or dangerous, unprotected, moving, mechanical parts. She should avoid occupational driving. [Plaintiff] could occasionally reach overhead with the left upper extremity.

(*Id.*).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not fully supported." (R. at 18). Then, relying on the vocational expert's testimony, the ALJ found that since May 28, 2021, Plaintiff has been unable to perform her past relevant work as a home health aide. (R. at 28).

Further relying on the vocational expert's testimony, the ALJ concluded that before November 27, 2023, the transferability of Plaintiff's job skills was not material to the disability determination because, even if her skills were transferrable, the Medical–Vocational Rules support a finding that Plaintiff was "not disabled" before November 27, 2023. (R. at 29–30). Before that date, considering her age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could have performed, such as a merchandising marker, storage facility rental clerk, or collator operator. (R. at 30). Yet, after November 27, 2023,

9

no jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. at 31). Therefore, the ALJ concluded that Plaintiff was "not disabled prior to November 27, 2023, but became disabled on that date" and remained disabled through the date of his decision. (R. at 31).

## II.  STANDARD

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.  DISCUSSION

Although Plaintiff raises several assignments of error, one decides the day. (*See* Doc. 8). Plaintiff challenges the ALJ's analysis of the medical opinion of consultative examiner Richard Fikes, D.O. ("Dr. Fikes"). (*Id.* at 8–17).

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations," based on all the relevant evidence in her file. *See* 20 C.F.R. § 404.1545(a)(1). The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2)

10

medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. § 404.1513(a)(1)–(5). For medical opinions, an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must weigh the opinions with various factors in mind. *See* 20 C.F.R. § 404.1520c(c)(1)–(5). Among them, supportability and consistency are the most important, and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2); *see also* 20 C.F.R. § 404.1520c(c)(2) (noting the ALJ may discuss the other factors but is not required to do so).

When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources in the record, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(2). For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his . . . medical opinion[,] the more persuasive the medical opinion . . . will be." 20 C.F.R. § 4041520c(c)(2). In other words, the consistency factor "requires the ALJ to compare the medical opinion at issue to other medical and nonmedical sources." *Elizabeth A. v. Comm'r of Soc. Sec.*, No. 2:22-cv-2313, 2023 WL 5924414, at *4 (S.D. Ohio Sept. 12, 2023) (citation modified). And the supportability factor considers "how well a medical source's own objective findings and explanations support his medical opinion." *Ford v. Comm'r of Soc. Sec. Admin.*, No. 1:22-cv-524, 2023 WL 2088157, at *17 (N.D. Ohio Jan. 31, 2023) (citing 20 C.F.R. § 404.1520c(c)(1)), *report and recommendation adopted*, No. 1:22-cv-524, 2023 WL 2080159 (N.D. Ohio Feb. 17, 2023); *see also Crystal E. J. v. Comm'r of Soc. Sec.*, No. 2:21-cv-4861, 2022 WL 2680069, at *6 (S.D. Ohio July 12, 2022) (saying supportability includes "an opinion's reference to diagnostic

techniques, data collection procedures/analysis, and other objective medical evidence"), *report and recommendation adopted*, No. 2:21-cv-4861, 2022 WL 2974734 (July 27, 2022).

Dr. Fikes examined Plaintiff in November 2021. (R. at 317–26). The ALJ found his assessment "less persuasive":

> **** Dr. Fikes opined [Plaintiff] could perform a less than sedentary level of work. It should be noted Dr. Fike was a onetime consultative examiner, who observed [Plaintiff] on a brief one time basis. Dr. Fikes appears to have based his opinion on [Plaintiff]'s subjective reports that she could walk 2–3 city blocks; could stand on her feet for less than an hour; could sit for 2–3 hours; could bend over and pick up objects with her right hand between 15–20 pounds; and would have issue lifting objects with the left shoulder and difficulty holding objects in her hands. It should be noted [Plaintiff]'s subjectively reported physical restrictions and the intern significant physical reduction to a less than sedentary level of work made by Dr. Fike are internally inconsistent with Dr. Fike's own examination findings. For example, while reducing [Plaintiff] to a less than sedentary range of work, Dr. Fike noted [Plaintiff] reported being able to perform her own basic activities of daily living, could drive, and walk stairs. He assessed [Plaintiff] was obese, but found no cardiac abnormalities or respiratory abnormalities upon examination. He noted some pain with decreased range of motion in the left shoulder, but found no joint swelling, erythema, edema, or synovitis of that shoulder or any other joint. Dr. Fikes specifically noted [Plaintiff]' showed cranial nerves that were grossly intact and cited [Plaintiff] possessed 5/5 strength in the upper and lower extremities outside of the slight reduction 4/5 strength in the left upper extremity. [Plaintiff] was noted to have no hyperreflexia, no pronator drift, and negative bilateral straight leg testing. Cerebellar function was found to be within normal limits. She was assessed with normal grip strength. She required no use of assistive devices or ambulatory aids. Thus, the [ALJ] finds Dr. Fikes' reduction to less than sedentary range of work was more restrictive than his relatively normal examination findings as noted herein supported. The [ALJ] finds his significant physical exertional reduction was not consistent with or well supported by his objective examination findings.

(R. at 27 (discussing R. at 317–26 (Dr. Fikes's opinion))).

Plaintiff argues the ALJ did not evaluate Dr. Fikes's opinion for consistency. (Doc. 8 at 11–12). The Undersigned agrees. The ALJ determined that Dr. Fikes's opinion is "internally inconsistent" because he recommended "a less than sedentary level of work" while finding no significant physical impairments. (R. at 27 (citing R. at 317–26)). Further, the ALJ found that Dr.

12

Fikes's opined limitations conflicted with Plaintiff's reports to him of her daily activities and symptoms. (*Id.* (citing R. at 319 (noting Plaintiff could bathe and dress herself, clean, drive, and climb stairs))). Given these discrepancies, the ALJ concluded that Dr. Fikes's "significant physical exertional reduction was not consistent with or well supported by his objective examination findings." (R. at 27). Yet all these statements analyze whether Dr. Fikes's opinion is supported by his "own objective findings" and explanations. *Ford*, 2023 WL 2088157, at *17. They do not speak to whether Dr. Fikes's opinion is consistent with the record as a whole. *See Elizabeth A.*, 2023 WL 5924414, at *4 (saying a consistency analysis "compare[s] the medical opinion at issue to other medical and nonmedical sources").

  Still more, while the ALJ cites Dr. Fikes's examination elsewhere in his opinion, he does not evaluate Dr. Fikes's findings, like his opinion that Plaintiff can do "less than sedentary" work, against other evidence in the record. (R. at 27 (discussing R. at 321)). For instance, in finding that Plaintiff's subjective complaints about her symptoms were not supported by the record, the ALJ cited Plaintiff's statement to Dr. Fikes that she completed certain activities of daily living. (R. at 24 (referencing R. at 319)). Additionally, the ALJ discounted the severity of Plaintiff's mental health symptoms by highlighting Plaintiff's report to Dr. Fikes that she drove "during the period under adjudication." (R. at 26–27 (discussing R. at 319)). At base, these statements compare Plaintiff's subjective reports of her daily activities, not Dr. Fikes's opinion, to other evidence in the record.

  Then, while discussing a previous administrative finding, the ALJ noted that its reaching limitations were "inconsistent with the evidence of record supporting rotator cuff impingement syndrome and left shoulder joint degeneration of the AC joint with limited range of motion and stiffness of the left shoulder." (R. at 26 (citing R. at 320, 674, 1220–21)). As support, the ALJ

13

cited one page of Dr. Fikes's physical examination, among other evidence. (*Id.* (citing R. at 320 (physical examination of Plaintiff by Dr. Fikes))). This lone comparison, too, is insufficient because in it, the ALJ truly evaluates the consistency of the prior administrative finding, not Dr. Fikes's opinion. (*Id.*).

Put simply, throughout his decision, the ALJ conflated supportability with consistency and failed to evaluate the latter at all. *See, e.g.*, *Kati M. v. Comm'r of Soc. Sec. Admin.*, No. 2:23-cv-4128, 2025 WL 444046, at *12–13 (S.D. Ohio Feb. 10, 2025) (finding the ALJ erred and evaluated only supportability where he found a nurse's opinion was internally inconsistent but did not consider other evidence and medical opinions); *Benjamin L. v. Comm'r of Soc. Sec.*, No. 3:22-cv-254, 2023 WL 3914510, at *5 (S.D. Ohio June 9, 2023) (saying the ALJ's citations to a doctor's "own clinical notes" only evaluated consistency); *Shanan v. Comm'r of Soc. Sec.*, No. 2:23-cv-1678, 2024 WL 3740443, at *7 (S.D. Ohio Aug. 9, 2024) (remanding where the ALJ conflated consistency with supportability and referred only to the doctor's own assessment notes).

Even so, the Commissioner asserts that the ALJ did enough. (Doc. 10 at 10–12). According to the Commissioner, the ALJ properly evaluated Dr. Fikes's opinion for consistency when he compared the opinion to "evidence such as Plaintiff's daily activities." (*Id.* at 10). This argument, however, overlooks an important aspect of the ALJ's analysis. When the ALJ compared Dr. Fikes's opinion to "Plaintiff's daily activities," the ALJ actually considered Plaintiff's statements to Dr. Fikes against his own findings. (*Id.*; *see also* R. at 27). For instance, the ALJ noted that Dr. Fikes's reduction to "a less than sedentary range of work" was incompatible with Plaintiff's reports to him that she could "perform her own basic activities of daily living, could drive, and walk stairs." (R. at 27 (referencing R. at 319)). This goes to supportability, not consistency, because the ALJ evaluated if Dr. Fikes's opinion was supported by Plaintiff's reports

14

to him, not if it was consistent with other evidence in the record. *Cf.* 20 C.F.R. § 416.920c(c)(2) (saying, for consistency, an ALJ must compare a medical opinion to "other medical sources and nonmedical sources in the claim"); *see also Kati M.*, 2025 WL 444046, at *12–13 (finding an ALJ's determination that a nurse's opined limitation conflicted with the nurse's other opinions went to supportability, not consistency).

The Commissioner also asserts that, "when read as a whole," the ALJ's opinion shows he considered whether Dr. Fikes's opinion was consistent with other evidence. (Doc. 10 at 10). Notably, the Commissioner cites no examples from the ALJ's decision. (*Id.* at 10–11). And upon review, the Undersigned finds none that can save the ALJ's opinion. At bottom, the ALJ's decision does not articulate how he considered the consistency factor for Dr. Fikes's opinion or assist Plaintiff or the Court in understanding why his findings were deemed less persuasive. *See Wilson C. v. Comm'r of Soc. Sec. Admin.*, No. 3:20-cv-457, 2022 WL 4244215, at *8 (S.D. Ohio Sept. 15, 2022) (reversing on a consistency error where the ALJ did not consider if a doctor's "opinions were consistent with evidence from other medical sources and nonmedical sources").

This error is not harmless. Had the ALJ given more weight to and adopted Dr. Fikes's finding that Plaintiff could manage "less than sedentary" work, Plaintiff says she would have been found disabled. (Doc. 8 at 16); *see Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) ("Even if supported by substantial evidence . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). The Commissioner does not contest this assertion. (*See* Doc. 10 at 9–12). What's more, without a proper consistency analysis, the Court cannot conduct the required meaningful review to determine if substantial evidence supports the ALJ's decision. *Wilson*, 2022 WL 4244215, at *8; *Benjamin L.*, 2023 WL 3914510, at *7

15

(saying the ALJ must provide "a coherent explanation of her reasoning" (citation modified)). Therefore, remand is required.

In the end, the ALJ may reach the same conclusion on the persuasiveness of Dr. Fikes's opinion. But the ALJ must "show his . . . work" and explain with sufficient detail how he considered the consistency factor for each medical opinion. *Shanan*, 2024 WL 3740443, at *7 (citing *Hardy v. Comm'r of Soc. Sec.*, 554 F.Supp.3d 900, 909 (E.D. Mich. Aug. 13, 2021)). Because the ALJ did not do so here, the Undersigned **RECOMMENDS** reversing his decision and remanding the case to the Commissioner and the ALJ under Sentence Four of § 405(g).

Lastly, given this recommendation, it is unnecessary to address Plaintiff's other assignments of error in detail. (Doc. 8 at 5–8, 17–19). If appropriate, the Commissioner and the ALJ may consider the other issues on remand.

### IV. CONCLUSION

For the foregoing reasons, the Undersigned **RECOMMENDS REVERSING** the Commissioner of Social Security's decision denying benefits prior to November 23, 2023, and **REMANDING** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

### PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or

16

modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo* and operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Date: June 11, 2025                   /s/ Kimberly A. Jolson
                                      KIMBERLY A. JOLSON
                                      UNITED STATES MAGISTRATE JUDGE